WILSON et al., Respondents, v. PARKE et al., Defendants; HEWITT and DAVIS, Interveners and Appellants.

### St. Louis Court of Appeals, May 22, 1906.

**FRAUDULENT CONVEYANCE:** Mortgagor and Mortgagee. In an action by the mortgagees to foreclose a second mortgage brought against the owner and the first mortgagee and purchaser under the first mortgage through mesne conveyances, the evidence is examined and held insufficient to show fraud on the part of the last purchaser so as to justify a judgment against it.

Appeal from Greene Circuit Court.—*Hon. James T. Neville*, Judge.

REVERSED.

*R. H. Davis* and *W. Cloud* for appellants.

A title acquired under foreclosure of a first mortgage will not inure to the benefit of a second mortgage, if the second mortgage is expressly made and taken subject to the first mortgage. 1 Jones on Mortgage (4 Ed.), sec. 679; Hizzley v. Heffernan, 9 N. E. 570; 2 Washburn, Real Prop. (5 Ed.), pp. 117-217. Hewett was interested in the property covered by plaintiffs' mortgage, and under chancery practice was a proper party defendant in an action of foreclosure. 9 Ency. Plead. & Prac., p. 320; 2 Jones on Mortgages, sec. 1425. And it was proper to permit him to intervene upon request. 9 Ency. Pl. & & Pr., 352.

*C. V. Buckley* and *H. S. Miller* for respondents.

(1) The evidence clearly showed that plaintiff Wilson went to Pierce City on the morning of the 14th day of December, 1903, for the express purpose of protecting plaintiffs' deed of trust. He met A. L. White, president of said bank and was told by him that Parke wanted an extension of time and that the bank had refused to grant him the extension but would give him ten days or two weeks' time in which to redeem the property and in the event Parke failed to redeem within that time then Wilson would be permitted to pay the bank the amount due it and thus protect his mortgage. We submit the following authorities on the question of fraud and its manners of proof: Hough v. Dickinson, 58 Mich. 89, Kaine v. Weighey, 22 Pa. 179; Hildreth v. Sands; 2 Johns. Ch. 35; Sands v. Hildreth, 14 Johns. 493; Deval v. Brandt, 53 N. Y. 462; Cooley on Torts, 557; Rea v. Missouri, 84 U. S. 17 Wall. 532; Kemper v. Churchill, 75 U. S. (Wall.) 362; Gregg v. Sayre, 33 U. S. (8 Pet.) 244; Vance v. Phillips, 6 Hill 433; Hennequin v. Naylor, 24 N. Y. 139. Cooley on Torts, 557; Ziekel v. Douglass,

88 Mo. 382; Hopper v. Gladden, 75 Ga. 532. Bigelow on Fraud, p. 476; 118 Ill., 334; Parker v. Phetteplace, 68 U. S. (1 Wall.) 684. (2) Means and opportunities of acquiring knowledge of fraudulent transactions inducing the sale of land are equivalent to knowledge. Lee v. McClelland, 120 Cal. 147; Wren v. Monsean, 95 Va. 369; Lawson v. Floyd, 124 U. S. 108; Bank v. Tobacco Co., 155 Mo. 602; State ex rel. v. Purcell, 131 Mo. 317, 33 S. W. 13; Appel v. Eaton & Prince Co., 97 Mo. App. 438, 71 S. W. 741; Deere Plow Co. v. Sullivan, 158 Mo. 448, 59 S. W. 1005; Stephenson v. Kilpatrick, 166 Mo. 269, 65 S. W. 773.

BLAND, P. J.—In December, 1901, H. B. Parke, under the trade name of Wentworth Lead & Zinc Mining Company, acquired a mining lease by assignment, on a parcel of land in the southeast quarter of the southwest quarter section 1, township 26, range 29, in Lawrence county, Missouri, upon which he erected a reduction plant and placed mining machinery, etc., for the operation of the mine. On August 16, 1902, the Wentworth Lead & Zinc Mining Company, H. B. Parke and wife, by their deed of trust, duly acknowledged, conveyed the leased premises and machinery and tools thereon situated to W. R. Scheldrup, trustee, to secure the payment of the promissory note of said Parke, of even date therewith, for the sum of twenty-five hundred dollars, to the Pierce City National Bank, the beneficiary named in the deed of trust; deed recorded September 8, 1902. On September 30, 1903, the Wentworth Lead & Zinc Mining Company, Parke and Wife, executed a second deed of trust on the same property, subject to the prior one, to A. L. White, trustee, to secure the payment of several sums of money due from Parke to N. U. Wilson and the other plaintiffs' aggregating $2,691.-21; deed recorded September 12, 1903. The trustees in these two deeds of trust were given power to advertise

and sell the property conveyed in case of default of payment of the sums secured thereby, and provided that in the event of the death, or the refusal of either of the trustees to act, the acting sheriff of Lawrence county should be authorized to advertise and sell. Default was made in the payment of the bank's note and deed of trust, and by direction of the managing officer of the bank, trustee Scheldrup duly advertised the property for sale under the deed of trust, and on the fourteenth day of December, 1903, sold the same in accordance with the terms of said deed. The bank became the purchaser of the entire property at the sale, for the sum of two thousand dollars. On the following day the trustee made and acknowledged a deed, as such, conveying the property to the bank; deed recorded September 30, 1903. On December 20, 1903, the bank by its deed duly executed and acknowledged, conveyed the property to John S. Cooke, of the county of Passiac, in the state of New Jersey, as trustee. This deed was recorded March 16, 1904. On April 22, 1904, John S. Cooke, trustee, by his deed, duly executed and acknowledged, conveyed the property to the Jovis Zinc Mining Company, a New Jersey corporation. This deed was recorded April 26, 1904. On April 22, 1904, the Jovis Zinc Mining Company, at the county of Passiac, in the State of New Jersey, made and acknowledged its deed of trust conveying the property to R. H. Davis, trustee, to secure the payment of two thousand dollars to William Hewitt, the beneficiary named in said deed of trust. This deed was also recorded. Default was made in the payment of the two thousand dollars secured by said deed of trust, and by direction of Hewitt, Davis, as trustee, advertised the property for sale under the terms of said deed.

The petition alleged, in substance, that the deed from the bank to Cooke, the one from Cooke to the Jovis Zinc Mining Company, and the deed of trust from the Mining Company to Davis, trustee, for the benefit of

Hewitt, were all made and entered into for the purpose of defrauding the plaintiffs; that in truth and in fact, Parke furnished the money to make the purchase from the bank and procured the deed made to Cooke, his brother-in-law, for the purpose of concealing the real title to the property; that the deed from Cooke to the Jovis Mining Company was made for the same purpose, and the deed from it to Davis, as trustee, for a like purpose, and all with the fraudulent intent to defeat the lien of the plaintiffs upon said property. The petition alleged that Parke is the real owner of the property and asked that plaintiff's deed of trust be declared a first lien upon said property, and that it be foreclosed and the property sold to satisfy the debts due the plaintiffs. The petition further alleged that White, the trustee named in the deed of trust made for the plaintiff's benefit, refused to act as such, and that defendant Connor, the acting sheriff of Lawrence county, also refused to sell under said deed.

Pending the suit a supplemental petition was filed, praying for an order to enjoin Davis and Hewitt from selling the property under the Davis and Hewitt deeds of trust. A temporary injunction was granted, which was made perpetual on the final hearing.

Defendants Davis and Hewitt filed their joint answer, denying the allegations of the petition and alleging the bona fides of the Hewitt deed of trust and of the other deeds charged by plaintiffs' petition to have been fraudulently executed.

The suit was commenced in the Lawrence Circuit Court but was removed by change of venue to the Greene Circuit Court, where it was tried, resulting in a finding by the court in favor of the plaintiffs, and a judgment awarding the relief prayed for in the petition. Davis and Hewitt appealed.

The only connection Davis, who resides in Lawrence county, Missouri, is shown to have had with any of the transactions set forth herein is that he, without his

knowledge, was named as trustee in the deed of trust given to secure Hewitt, and when requested by Hewitt to act as trustee, consented and at Hewitt's request advertised the property for sale. It appears from the evidence that Parke and wife were residents of the state of New Jersey; that the leased property did not prove to be a paying mine while in the hands of Parke and he became involved in debt in the operation of the mine. A. L. White was president of the Pierce City National Bank, in 1901, 2 and 3, and was on intimate terms with Parke, and on account of his friendship for him and his wife used his influence to postpone the foreclosure of the bank's deed of trust as long as he could, and succeeded at one time in having a sale called off which had been advertised to take place. It was at White's suggestion that Parke and wife executed the second deed of trust to secure Parke's indebtedness to the several plaintiffs and by agreement of parties he was named as trustee and made the depository of the deed. Wilson, who had been superintendent of the mine while it was in the possession of Parke, was the active creditor among the plaintiffs. Wilson testified that he went to Pierce City on Sunday evening, December 13, 1903, to see White, president of the bank, about the sale that was to take place under the bank's deed of trust, at Mount Vernon on the following day; that White was not at Pierce City and did not arrive until eleven o'clock that night, when he met him at the depot and White invited him to come around to the bank the next morning at nine o'clock; that he did so and White showed him two telegrams, one from Parke and one from Parke's wife, who were both in New Jersey at the time; that Parke's telegram read: "Hold the sale for a week. I will take up the proposition and pay you your money." The one from Mrs. Parke was an appeal to White to try to protect their interest and not let them lose everything. The witness continued as follows:

Wilson v. Parke.

"I did all of the business for the company while I was there. I worked there for two years. Mr. White and I had talked this matter over. In fact the property had been advertised once before for sale, and before the day of sale Mr. Parke raised $500.00 and paid on that mortgage. It was originally for $2,500. He raised $500, and paid on the mortgage and stopped that sale; and we had often, Mr. White and I, had often talked about the matter, and thought that him, or some of his friends, or her friends, their brother-in-law, would come in and rescue the property and not let it sell. When I saw these telegrams that morning I says: 'That settles it. Mr. White, they are going to take this up. We have talked several times, and I don't think I had better interfere. Let them take it up,' and I didn't go to Mt. Vernon.

"Q. What did he tell you, if anything, in reference to what the bank would do? "A. Well, I urged action, so I would know what to do. The board was called together that morning, which I presume they are every Monday morning, or maybe every other morning, and had a meeting. I was inside the directors' room, and also in behind the railing of the teller, Mr. Coppock, and we were all in there together and were talking over this matter. He says, 'They have decided to give Mr. Parke—to sell the property and bid it in for just their claim, and give Mr. Parke a week to take it up in.' I says, 'That is all right, but if he don't take it up, I am ready to take it up; I am ready and anxious, and if he don't take it up, I want to take it up, because that makes my trust deed good.'

"Q. Did you leave then, or was there anything further? A. I stayed around there until the train went west, about 9:30. There was a gentleman with me who was going to take an interest in the property with me, if we had to bid it in. We went down and looked over the mine, at Mr. White's suggestion.

"Q. State to the court if you would have bid that property in at that time, except for what Mr. White told you? A. Certainly. I went there for that purpose."

White refused to advertise and sell under the second deed of trust, or to surrender the deed to Wilson, whereupon Wilson requested the sheriff (Connor) to act as trustee. Connor at first consented to advertise and sell under the deed of trust, but when he was put in possession of the facts growing out of the sale under the bank's deed of trust, he refused to act further. Wilson then procured the keys to the mining plant from the watchman in charge and took possession and held possession from two to three weeks, when he was forcibly ejected. He then brought suit for forcible entry and detainer, but on the trial the verdict of the jury was against him.

The following letters were offered in evidence:

"December 23, 1903.

"Mr. N. U. Wilson,

"Joplin, Missouri.

"Dear Sir:—Your favor of yesterday's date has been received. From the way things look this bank will have no trouble in disposing of the mining plant bought in by sale 14th instant. There is an option on this property that expires 26th instant. Price of plant is what it cost the bank. Now if the parties do not take up their option and pay cash for the property on or before the 26th instant, and your crowd want it on the same terms, will see that you can get it. But you will have to notify bank Saturday, 26th, that night, or the Monday following, 28th, by 8 a. m. Bank claims will not exceed $2,200, which includes royalty claims. Answer.

"Yours truly,

"A. L. WHITE.

"Pierce City, Mo., Dec. 25, 1903.
"Mr. N. U. Wilson,
Joplin, Mo.

"Dear Mr. Wilson: — Your letter 24th received. You certainly misunderstood my letter. However there is no explaining matters as the plant is sold and money paid for them. Time of option to Mr. Parke was extended and yesterday acceptance was wired here. Have every reason to believe that one of Mr. Parke's friends, a Mr. Cooke, furnished the money and deed will be made out in his name. Had that end not taken up our offer to redeem, your crowd would have had a chance to take up the property. There has been no desire on part of the bank to keep the property, in fact, they have acted just as I told you they would do. So don't you or any of your friends think to the contrary. All the bank ever wanted was to get the money coming to them. Am home and not well. Write me if you want any further information.                              "Yours truly,
                                          "WHITE.

"Pierce City, Mo., 12-15-03.
"Dear Sir: Sale was made of plant yesterday by trustee and bought in by bank. No other bids. If Mr. Parke or his friends on his behalf want property, Bank will make deed for same upon its claim being paid.
                                 "A. L. WHITE."

And also the following letter from Parke to White:

"I deposited to-day with the National Park Bank $2,190.06, as per your favor of the 18th, and hold their receipt therefor, of which they are to advise you by wire. Kindly have it made in name of John S. Cooke, trustee, and mail him at Pátterson, New Jersey. I am very thankful for the result, and desire to extend thanks for the opportunity."

119 App.—3

J. E. Coppock, cashier of the Pierce City National Bank, testified that the bank had corresponded all the time with Parke until it conveyed the property to Cooke; and on December 18, 1903, he wired Parke that the amount due the bank was $2,190.06, and wrote him the same day giving the details, and informing him that the amount could be deposited with the National Parke Bank to the credit of the Pierce City National Bank, on or before the twenty-eighth of December; that White, president of the bank, wanted to postpone the sale but was overruled by the board of directors, who ordered the sale to proceed as advertised, and Wilson was advised to that effect on the morning of the day the sale took place.

In respect to the condition of the mine, Parke gave Hewitt the following written statement to induce him to aid the Jovis Zinc Mining Company:

"Wm. Hewitt, Esq.:

"The financial condition of the Jovis Zinc Mining Co., for whose benefit your loaning two thousand dollars, taking as security for loan, a mortgage on the plant owned by the said company at Wentworth, Mo., is as follows: A Purchase money mortgage of twenty-two hundred ($2200) dollars. The mortgage to you two thousand ($2000) dollars, and a floating debt of about three hundred dollars ($300). The capital stock of the company is $50,000, of which $43,300 will be issued.

"Yours,

March 23, '04.                    "H. B. PARKE."

The evidence of Hewitt and Cooke, the latter being president of the Jovis Zinc Mining Company, shows that Hewitt indorsed and agreed to take up four notes of five hundred dollars each for the Mining Company, and that said company executed the deed of trust to him as security and Hewitt took up and paid off the said four notes.

W. C. Van Blarcom testified that he was a traveling

salesman and knew the mining property; that he and Cooke bought it from the Pierce City National Bank, Cooke taking the deed as trustee; that they paid twenty-two hundred dollars for it and afterwards sold it to the Jovis Zinc Mining Company and took a purchase mortgage for twenty-two hundred dollars. The balance of the purchase price, witness stated, was paid in the stock of the mining company, that Parke was the manager of the company, at a salary of fifteen hundred dollars per annum, but owned no stock in the company and was not in the least interested in the purchase made by himself and Cooke; that the purchase money was furnished by himself and Cooke, each furnishing eleven hundred dollars, and the purchase was made for their sole benefit; that Cooke was a retired locomotive builder and an officer in the Patterson National Bank of Patterson, New Jersey.

A. L. White testified that he notified all the plaintiffs of the sale to take place under the bank's mortgage; that there was no understanding between the bank and Parke that the bank would sell the property, bid it in and give Parke the option to redeem it, but after the sale he wired Parke that he or any of his friends could have the property at what it had cost the bank, but that the offer was limited to December twenty-fourth. Witness further testified: "I have written a good many letters as an individual, but appertaining to the bank, claiming that the bank is in no way responsible, for I did it to settle the claim of the bank, and also to give my friend, Mr. Wilson, a chance to get out of his trouble, and all communication of that kind are signed by me as an individual. Furthermore, at two different times the mining plant got into financial trouble, and through my efforts the workingmen were paid for their labor." Witness also testified that after the Jovis Mining Company acquired the property, Parke took charge of it, as superintendent, and operated it for a time, and though from

ten to eleven hundred dollars was furnished him from the east to operate the mine he was not able with this sum and the proceeds of the mine to meet expenses, and returned to the east leaving a number of claims for labor and supplies unpaid.

The plaintiffs' evidence shows that Parke is wholly insolvent. The most favorable deduction which can be drawn from the evidence is, that Wilson was misled by the promises and representations of White, president of the Pierce City National Bank, and by him induced to refrain from attending the foreclosure sale under the bank's deed of trust, relying on White's promise, that if Parke did not redeem the property, the plaintiffs should have the privilege of buying it from the bank at its cost to the bank. If this deduction be drawn, then the transfer of the property by the bank to Cooke, if made with the intent to cut out plaintiffs' lien, was fraudulent as to plaintiffs. While we do not think the evidence warrants this deduction, but are of the opinion that Wilson, after seeing Parke's telegram to White, relied more upon his belief that Parke would redeem the property than on any promise made to him by White to protect the plaintiffs' lien, yet for the purpose of this case, we may concede all that plaintiffs claim, in respect to the alleged fraudulent conveyance from the bank to Cooke, and that Cooke held the property in trust for Parke. How about the conveyance from Cooke to the Jovis Zinc Mining Company? There is not a scrap of evidence in the record connecting it in the remotest degree with the fraud of the Pierce City Bank, Parke and Cooke. Parke, according to the evidence, is not a stock holder in the corporation, nor is there a ray of evidence showing or tending to show that the corporation did not purchase the property from Cook, in good faith and for a valuable consideration. A court may, from proven facts and circumstances, find a conveyance was made to defraud the creditors, of the grantor generally, or a particular creditor,

or set of creditors, but a court cannot find a conveyance to be fraudulent as to the grantee on the mere fact that his grantor acquired the property conveyed through a fraudulent conveyance. A purchase of property for a valuable consideration is presumed to be bona fide until the contrary is shown by direct evidence, or by the proof of facts and circumstances from which fraud may be reasonably and logically inferred. This discussion applies with greater emphasis to the Hewitt deed of trust, which, according to all the evidence, was given for a valid consideration and in perfect good faith. From the fact that the deed from Cooke to the Jovis Zinc Mining Company, and the deed of trust from the latter to Hewitt are dated on the same day, the inference is that the Jovis Mining Company borrowed the two thousand dollars of Hewitt for the purpose of enabling the company to pay Cooke for the property, and it is certain that this money did not go to the Pierce City National Bank, for it had been paid for the property by Cooke or Parke at a prior date (December 20, 1903), and there is not a ray of testimony to connect either the Jovis Zinc Mining Company or Hewitt with transactions between the Pierce City Bank and Parke or Cooke, except they derived title through them by mesne conveyance of the property, untinctured by fraud, so far as the evidence shows.

The judgment of the circuit court is therefore reversed, and judgment will be entered here dissolving the injunction and dismissing plaintiffs' suit at their cost. All concur.